Please step up and identify yourselves. You know our rules that usually it's 15 or 20 and we're somewhat liberal but don't live up here. We don't want to be here at the 1 o'clock or 1230. Good morning, your honors. Robert Hirschhorn, State Appellate Defender for David Banks. Good morning, your honors. Assistant State's Attorney Sheila O'Grady-Kroniak on behalf of the people and I will be arguing the issues that do not relate to the DNA evidence in this case. Good morning, your honors. Assistant State's Attorney Amy Wotroba here on behalf of the people. With this court's permission, I will be arguing the arguments related to the DNA evidence. All right. Proceed. Good morning, your honors. May it please the court. David Banks was convicted of first degree murder and arson in 2013 for offenses that occurred in 1990, almost a quarter of a century earlier. He wasn't even arrested on these charges until 2005. That's because this is an old case. We know all these things. We've read the briefs. Let's get into your arguments. I want to concentrate on the DNA argument, the first argument here, your honor. Because this case involves the intersection of a complicated area of DNA and frankly also some mathematics. And without DNA, there's just no prosecution here. But we have problems with the DNA evidence. We have multiple problems with DNA evidence in this case. It suffers from a gap in the chain of custody. The expert testimony on this, the testimony which generated the drumbeat number 52 billion to one used over and over again in front of this jury, that expert used an outdated methodology to generate the number. Apart from the problems in the chain of custody, apart from the problems in the methodology, she botched the performance of the test. And because she botched the performance of the test, we have probably the key feature of this appeal. We're not dealing with a full DNA profile. We're dealing with a partial DNA profile. You're not alleging. You got me first. Is the fact that the method, as you suggest, is outdated, make the method any less valid or legitimate? I think the reason that the method has become outdated makes it less valid. Is there a basis for that? Yes, because the change in the methodology here, the change from what was done in 2005, the change that was made in 2009, was to increase the reliability of the test, to eliminate the possibility of contamination. That becomes crucial here when we're talking about a case where we have a broken chain of custody. The chance of contamination... Let's get to that. Where is it broken? The DNA was first submitted for testing in 1993. Elizabeth Benzinger of the, I believe, the Chicago Crime Lab did the testing. When she was done, she reduced her DNA extracts to what she said was a high-tech piece of filter paper. She literally dried the fluid she had tested onto a piece of paper. That was put in storage back in 1993. It was frozen. The Vitullo kit, sometime between 1993 and 2002, was lost entirely. So when they reopened the case, when the cold case unit started looking at it, what they ultimately found was they couldn't find the Vitullo kit. All they could find was her DNA extracts. What she said was dried onto that piece of high-tech filter paper. But Sonara Anderson, the Illinois State Police Crime Lab expert, the one who testified, generated the profile and generated this 52 billion to one number. She didn't say anything about getting a high-tech piece of filter paper. She got test tubes. So it's not only how they store the paper in the test tube. Your Honor, what she said, though, was that— Yeah, it's not—it's what is the procedure that is normally performed. And in Springfield, the state police normally put that paper in a test tube and keep it and store it so it cannot be contaminated, number one. And number two, so it can be properly frozen and stored and transferred easily. Your Honor, except for the fact that when she said she didn't get a test tube with a piece of paper in it, what she described was a test tube with the genetic materials dried to the inside of the tube. That's all speculative. No, that's her testimony. But the identifiers with respect to what was in the test tube were the same with respect to what was extracted and placed on the filter. I don't think the record is— Wasn't that her testimony? I don't think the record is exactly clear on that. I know the state has briefed it as if the numbers that were added to this were crystal clear and they just track all the way through. She started labeling things with the Petullo kit. The numbers one, two, and three, and A, B, and C all came with the Petullo kit. It was the Petullo kit that was lost. I don't think the record is all that clear that it was those numbers which tracked to this test tube. And again, I— We did argue that, but it's doubtful your argument flies. I'm not sure I agree with you, Your Honor, and I'm sorry, but I have to maintain that it should here. Right. Obviously. You have to make an argument, but I'm saying I think your argument is speculative. I think the argument is solidly grounded in the record. Unfortunately, when they did this at the lower court, the attorneys were not the best. But, Your Honor, we're locked into this record. Right. This record is telling me— But we have to understand what is normal procedure. There's nothing in this record that tells you that the normal procedure in 1993 would have been to put this in a test tube that would have resulted in 2005. If you looked up the state police procedure, you would see it is. But go ahead. In any event, we maintain that the chain of custody is broken, that the numbering is insufficient because what she described as receiving is not what Benzinger described as having been stored. And adding to that is the fact that the record says that she had to request the materials twice. And she didn't accept the first one because she questioned it. And so what did she get from Benzinger? Was what Benzinger put in storage the first thing she got that she couldn't get? Was it the tubes? We don't know. The record doesn't tell us. All the record tells us is we've got high-tech piece of filter paper frozen. That's how I did it in 1993. Test tubes that were the second thing delivered to her in 2005. I would insist that we have enough here that we don't have a complete chain of custody. We can't say that this thing tracks. That's why changing the protocol becomes so critical. I'd move on. I want to address the protocol and the botched test nonetheless, Your Honor. The protocol change was that you have to maintain the original slides, the original blank and controls, because the contamination can be sourced from that, and those were lost. Those were either discarded or just lost. Benzinger was not clear as to what happened other than she didn't do anything to maintain or preserve those. So those were gone. And there's a second thing that I think we have to look at here is that Sarah Anderson, who tested in 2005, said, Without that, I made my own blank. They did a different kind of testing in 2005 than they did in 1993. In 1993, they did DQ-alpha testing. DQ-alpha testing, as I understand it, focuses on what's called the human leukocyte antigen, which was one of the first genes that was completely modeled. That was dropped out by the FBI in 1997, 1998, somewhere in that area. I don't know what reagents Elizabeth Benzinger used to make her slide. I don't know if those would be the same reagents that Sarah Anderson would be using in 2005 when she's doing profile-to-profile, the currently predominant form of testing. So I don't know if her control, her blank, which she made at that time, can recreate what was done by Benzinger. They may be talking about completely different reagents because you're talking about completely different tests. It can't be recreated. So we have a problem now with even if you don't have the break in the chain of custody, we have a problem with we're using a reagent blank here that can't or may not or possibly cannot have recreated the blank that was lost back in 1993. So we can't eliminate the possibility of contamination. Maintaining the control and maintaining the blank is the reason that they changed the protocol,  So what is tested in 2005 may not reflect contamination that they could have detected had they used a new protocol. So even without the break in the chain of custody, which I, again, respectfully, Your Honor, would still maintain it's there, we have a problem with the protocol, the loss of the blanks. And then finally we have, just in terms of the testing, we have the fact that she bites the test. She goes through amplification. It was called alternatively chemical xeroxing and genetic xeroxing. It's PCR. The brief is in the wrong sequence as to the spill occurred before the testing. I think she contradicted herself on that, but I don't think it makes a difference whether she amplified after separating or before separating. In either case, she amplified before testing. She has, whether she separated, spilled one, not the other, she still has this vial, this test tube of genetic material. She can go through a second round of PCR in this, pour it into the other and do testing. Whether that was done before or after the separation is really irrelevant. It doesn't make a difference. It's a difference without any effect here. She could have re-amplified and had another. And she said in her testimony, when I put it in, I know I didn't have enough for testing. And that's why we get this nine loci match instead of a 13 loci match. Furthermore, I note that, again, my understanding here is that when we're talking about nine loci match here, the co-filer, the second part that she didn't do, tests for more than four loci. There's an overlap between the two. It's kind of a built-in safety feature. So I think you're testing the co-filer for six and two of those were already tested for in the pro-filer part. They should match. And if they don't, you've got another major problem. So now we've lost another element of controlling the reliability and validity of the test because we lost that part of it through a spill. And I can't emphasize to you enough that the loss here is significant. It is potentially exonerating. The easiest way I can do this is, frankly, by metaphor. I've got a lottery ticket. I've matched the first four numbers and the Powerball. If I go to the lottery authorities and say, give me the jackpot, they're not going to do it. But you've got nine matches. You've got the first nine matches. Yes, you've got the first nine. And in my lottery example, I have matched four out of five and one. I'm still not getting the jackpot because unless I have that fifth number before the Powerball, I don't have it. You talked about the Wright case, but did you read what Jovan said in the Wright case? Where he says nine. And I've never seen anything excluded after nine matched. Yes, and he also said it's an error. I believe it was Mr. Parker who said that it's an error to even call it a match at nine. Not Jovan. Jovan said just nine. No, I think it was Parker. And that's one of the cases you're relying on. Which, by the way, you are aware that that case was pulled twice for errors in it. And the panel, it couldn't agree that he couldn't get three votes. He couldn't get two votes. Finally, he managed to get two after he wrote it a third time. And the dissent still is considered to be the true opinion in that case. Well, Your Honor, I'm aware that Crawford also has criticized that. And I don't think, for my purposes here, that that's as significant as the fact that nine loci still allows for four missing loci. Even if you have a match at nine loci, any of the four missing loci could reduce this from 52 to a million that he's the guy to a zero percent chance that he's the guy. Yeah, and that's not what Jovan said. He said just the opposite. I don't think so. I think he called it a match at nine loci, and he was willing to go with that. And I think at this point you're starting to talk, again, in terms almost of what fingerprint experts are talking about. How many different individual identifiers do I need before I can say a fingerprint is a match? And if he's saying nine loci, to him that's enough. That doesn't change the fact that the four missing loci, if he doesn't match, exonerate him. But, again, we're talking speculative. We don't know that, but we don't know that not through any fault of David Banks. We don't know it because Sonal Anderson botched the test, and we ought not visit on David Banks. Hurrah, which is precisely what has happened here. He was not responsible for the fact that she spilled it. He was not responsible for the fact that she didn't go through a second round of amplification. He wasn't in the room. The result is we get a nine loci match where there were four outstanding loci, by any one of which could exclude him. In fact, since profiler tests, I believe it's six loci, if the frequency of any one of those is just one in ten, six loci is one in a million. You seem to be forgetting something, though. You get a nine loci match, and then he gets called in for questioning. Yes. And he gets a little chatty, doesn't he? He says, they refer to it as confession. I would dispute that this is a confession. I mean, he never says, yes, I did it. He puts himself there with a couple guys on his head and his hair's on fire, and he knows other details, and, you know, he got a little chatty. I don't know how you can in good conscience stand there and say it's potentially exonerating in the face of this record. Your Honor. That the DNA would be exonerating. If he doesn't match those four loci, the DNA is gone. There's no DNA evidence. Everything else is the fruit of the DNA evidence in the first place. But putting that aside, his statement would be, you say he got talky. He was saying things like, you know, the others took over. I have no recollection of what happened. You know, I remember going in, and when I came out, hair on fire. It's not like he was in there saying, yes, I did this, I did that, and I did the other thing. He may have been present, but that's not a confession. But this jury was never asked to convict him based on this alleged statement. Well, I think you go a little bit too far there. The problem that I'm having here is that if there are problems that you describe in chain of custody, and you may, you know, take a different view of them than others would take, but let's say that there are problems in the chain of custody. Based upon the way I look at the case law, it seems that it goes more to the weight than to the admissibility. And if that's the case, and then you have his interview with the police, you know, I don't know where you're going. I think it's the break here, I think, Your Honor, is more than just, you know, it goes to weight. You know, I thought it was a yellow screen, and it turned out to be awkward or something like that. We're talking about a piece of paper and a test tube, which she described as having something dried on the inside, not as containing a piece of paper. But just following up on Justice Lavin's comment, so now we have the DNA, which you assert or allege is, you know, the testing is botched. We also have the statement, which you dispute qualifies as a confession. But it does place the defendant at the scene, and he knows an awful lot about what is at that scene. He knows it's a basement apartment. He knows, you know, Mr. Sousey, I believe his name is, and he has an encounter with him, and he's able to describe him to some extent. And he's in that basement apartment, and he describes that another woman comes in to the apartment. So he knows an awful lot. But even if we discount that that's even a confession, then we have yet this other piece about what the young lady does at trial. Does she not describe him? Does she not describe her? And his IDs. And his IDs and the tattoo. So what do we do with all that, even though we've got this? Well, let's remember that all that led initially to the arrest of Albert Chaney. He was arrested. Yes. That same witness, that same description, everything else, led to the arrest of somebody else who was exonerated by the DNA. But was there any attack on her credibility at trial? Just as to the fact that she was so young at the time, and the description of various things was a little bit fluid. Because there was no testimony with respect to identification testimony. Defendant didn't present an expert witness with respect to identification and the temporal space between when the attack happened and when it happened. That was also pre-Rama. All right. But to get to one of the underlying premises of your question, initially when you talked about he was familiar, his testimony was that he had been there before. We don't know that this familiarity you're talking about is a result of what happened that day. His testimony that he had gone there. This may have been a cold case, but when they got him into that room, he had some pretty hot details about what had happened. They may have gotten him in there because of his DNA, and you may not like the chain of custody, but... Burnt hair. Pardon? Burnt hair. Burnt hair, yes. I mean, these are things hard to just put aside. I mean, they're facts that bring you right home to the actual event. Ultimately, Your Honor, we have to decide whether he got a fair trial. Ultimately, we have to decide whether what happened in this case with this evidence that was so heavily canted towards DNA, where they start out with the number 52,000,001, they end with the number 52,000,001, and they keep telling this jury all through the trial that number. Everything else in arguments to this jury was really extra. I want to know why. You know, I had an interesting question when I started reading this. Why was he on the street in the first place? How did he get out of the first murder so quick? Your Honor, that's not a question that I can answer. I know. I just, you know, it lifts me that a guy like that could be walking around. Well, Your Honor, let me then shift slightly then. I hadn't intended to get into it, but that kind of leads rather naturally into the jury instruction question, where there were two priors that were introduced. There was a 1984 sexual assault that was introduced as propensity evidence. There was that murder, which was introduced for purposes of impeachment. But the written jury instructions that the jury got here did not distinguish between the two. They were told you've got evidence of a prior conviction. It can be used for propensity. But there was no objection. No objection. And those are the proper instructions to be given, and the judge did distinguish what they were to look at, even to the point of discussing intent. Your Honor, the discussion that occurred at the time the evidence was actually admitted was, I would suggest to you, less important than the fact that the written instructions that they were read, that they were handed, they took back into the jury room, didn't draw that distinction. And this is where I think the Anderson case — But what do you think the jurors, when they got that, are they going to go, oh, is this propensity? Is this credibility? I think there's a serious risk that — They're not going to go into that depth. I've been in five or six jury rooms, and I sat in the corner and didn't say boo. But no jurors would be that sophisticated. They would look at propensity. We were told about propensity. The other one, they wouldn't even think of. Well, Your Honor, if that were the case, then you're really suggesting that the Anderson decision that we cited in the reply brief was wrongly decided. Because that was a case where there was a murder victim and an intent murder, and the instructions didn't distinguish the purpose of intent between the two victims. And even though it was a proper IPI instruction, even though there was no objection, the court said this didn't result in a fair trial because the jury could have described this. The same possibility exists here because of the antipathy you evinced here. How did he get out with a murder? That makes it that much more important here that when they get that kind of information, prior offenses that we know because courts have been telling us for eons, it's too probative, it overpersuades jury, that you have to be really specific here. You have to tell them, that one you can consider for propensity. And let me tell you which one it is in these written instructions. And that one I'm only letting you consider for purposes of impeachment. The instructions should have done that because jurors, I think, may have had Your Honor's inclination on hearing that and wonder why he's held. So are you suggesting a non-IPI? I mean, what are you suggesting? I'm suggesting what we said in the reply brief, that you just modify the IPI and strike the language of prior conviction and insert the name of the conviction. And then would we likely be looking at if the defendant had been convicted that the trial judge erred in giving a modified version of the IPI? Not if he requested it. They forfeit the issue. But it would eliminate the possibility that the jury could take one that is only for propensity and use it for impeachment of one on murder conviction. I wonder how many other cases have this same question. I wasn't able to find one with this specific combination. I don't mean where it's been challenged. I'm saying what occurs at 26th Street. I'd say that occurs every day. I don't know, Your Honor. I do. Okay. I know I have gone over and I want to reserve some time for rebuttal. So unless Your Honor has some... No, thank you. You were very persuasive.  Even over the battlefield. It is what it is, Your Honor. Good morning, Your Honors. Again, Assistant State's Attorney Sheila O'Grady-Kronick. I would just briefly like to respond to Defense Counsel's allegations regarding the jury instructions and then my co-counsel will address the DNA evidence with your permission. The jury in this case was absolutely properly instructed and Defense Counsel has forfeited and admitted in his brief that the issue is forfeited because the trial counsel did not submit alternative instructions. Trial counsel in this case followed the absolutely reasonable trial strategy of not highlighting to this jury right before they begin their deliberations that his client had previously been convicted of murder and that his client had previously been accused of sexual assault right before they're about to deliberate on very similar charges. Trial counsel absolutely made a reasonable strategic decision to not request to modify the jury instructions to highlight those prior convictions. Defendant cites Anderson in his reply brief, but Anderson explicitly limited itself to the narrow set of facts in that case. The defendant in Anderson was accused of attempt murder and murder and the instructions did not clarify between which victim and so the jury in that case could have reasonably assumed that the attempt murder charge applied to the murder victim and thus convicted him on both. But Anderson does not control in this case because in its opinion, this court specifically stated that Anderson was limited to the narrow set of facts in that case. In this case, the jury was properly instructed. They were instructed that the certified copy of defense conviction was only for his impeachment and they were instructed that the testimony of the prior sexual assault was just for propensity evidence. Again, the chances of them being confused was minimized. Also, defendant's prior sexual assault was only referred to as an incident and never even referred to as a conviction. The jury was never even informed that he was convicted of sexual assault. They just received the testimony of GR that defendant had sexually assaulted her. So defendant has waived this issue and cannot rescue it with ineffective assistance of counsel where it was not deficient performance and where there was no prejudice. And then with your leave, I turn it over to my co-counsel. Good morning, Reiners. Again, Assistant State's Attorney Amy Wotroba. Most of defendant's arguments related to the DNA evidence. If you could keep your voice down. Oh, sure. Most of defendant's arguments. That's for recording, not for amplification. Okay. I won't as I'm getting over a bit of a cold, but I will try to project as much as possible. Defendant raises substantive arguments related to the DNA evidence and then almost point for point also raises claims of ineffective assistance of counsel that line up with those arguments. So I think the best way for me to approach this perhaps is to kind of address each issue in turn and also comment on the effectiveness of counsel. But first I would like to say that overall the picture that the defense paints in their brief and suggested to explain argument that the defense attorneys in this case did not challenge the DNA evidence is not borne out by the record. It was, in fact, contradicted by the record. The strategy of these seasoned public defenders, Mr. Anderson and Mr. Venish, is clearly that they were challenging the DNA from the get-go. And a defense attorney's strategy pre-trial with respect to what motions to file and what arguments to make is not necessarily the same that plays out at trial. In their brief, the defense refers to defense counsel's approach to the DNA as schizophrenic. And that is simply not a fair characterization. Because when defense counsel is raising issues pre-trial, like, for example, there was a motion filed to try and suppress all the DNA evidence based on the taking of defendant's buckle standard with respect to his previous conviction that has not been repeated here on appeal, they're raising issues not only to try and get some relief possibly for trial, but also to preserve them possibly for appeal. With respect to the COBA search issue, the offender database issue, which these searches, as I'm sure your honors appear to be aware, are not scholarly publications. They are searches that were done of different offender databases over the years to see how many coincidental matches there were at nine loci. So at the time, pre-trial, the Harvey Wright case was out, and therefore counsel raised an issue regarding Wright. Counsel also requested a search, but then withdrew that request when he was able to obtain the data that had been done in other searches. Counsel then opted not to try and get that information in at trial substantively. He did want to ask some foundational questions, which he then backed off from, because he wouldn't have been able to put it in, quite frankly. He couldn't have proved it up, any relevance whatsoever. But that doesn't mean that that was an unsound strategy. Had counsel gotten in the substance of those offender searches, that would not have helped his client. That could have opened the door, for example, to the fact that defendant's DNA profile was in the offender database of the Illinois system and that of the hundreds of thousands of offender profiles, there's only one that matches at these nine loci, and that is of David Banks. That certainly would have not furthered defense counsel's approach to defending his client in this case. Also, that choice could have been attacked based on the fact that there are relatives in the offender database. Therefore, it has been stated repeatedly that it is not an appropriate place to conduct a type of population genetics type of analysis. The first search was done in 2001 or 2002. It has now been almost 14 years, and there has been no one to come forward to claim, credibly, that this in any way calls into question the way the calculations are done in DNA cases. If there had been, I know that the Wright opinion believes that that is the case, however, that has been discredited. Harvey Wright is wrong, and that's the state's position. It also could have brought in, opened up the door to the bringing in of another type of calculation that counsel references in the brief, which is the database match probability, which is different than the random match probability. The random match probability asks, what are the chances of plucking one person at random out of the population and having them match this particular profile? The database match probability asks, what are the chances of finding somebody in a database of a certain size that matches that profile? Again, since Mr. Banks is the only person who has that profile, that number could have actually hurt him. So, as you all are aware, the standard of review for ineffective assistance of counsel claims is that trial strategy is presumed. Competence is presumed. And I submit to you that this, not only should it be presumed in this case, but the record also supports it, and that all defendants' arguments suggesting that counsels were ineffective are purely speculative. The chain of custody argument, I believe, is probably the best example of it. As Justice Cox pointed out, all of the identifiers are the same. The Illinois State Police exhibit numbers match. Exhibits 1, 2, and 3. I'd note that the number of items match. When Kenara Anderson testified as to the number of tubes she received, she got one tube of extracted DNA from the victim's standard, one tube of extracted DNA from Mr. Cheney's standard, and then three tubes of extracted DNA from exhibit 3, which makes sense because Ms. Benziger had testified, you do differential extraction on a semen sample. So you have the F1, the F2, and the F3. So you have identifiers matching, you have numbers matching. You further have direct testimony on page 174DDDD of the record, which is omitted from the defense brief, where Kenara Anderson specifically says, at this time I received the tubes of extracted DNA that the prior DNA analyst had created. So there was our exhibit 1A, which is extracted DNA from Thu Chau, our exhibit 2A, which was reportedly extracted DNA from Albert Cheney, and exhibit 3A, which contained the F1, which is the female fraction or the non-sperm fraction, the F2, which is the sperm fraction, and the F3 fraction of extracted DNA from the vaginal swab of Thu Chau. Those are identifiers. These items are marked. The reason they understand that counsel is saying there's a discrepancy, it is true, Your Honor is correct, the filter paper is inside the tube. Ms. Benziger testifies that the filter paper is sealed. It is sealed in the tube. While she may not have said tube, the reason that that was not elicited by counsel or that it was unnecessary is because when everyone was in agreement that there was no chain of custody issue, why would that be brought up? Why would defense counsel seek more specificity? In fact, that probably would have hurt his argument, since, again, the theory in this case was to attack the DNA evidence in the best way that they saw fit. It was to focus on the spill, not on the reagent blanks. To focus on the spill to make it look like Kanar Anderson made a mistake with the analysis and maybe the jury shouldn't accept the DNA evidence because it was only a partial and maybe there could have been a full. The reagent blanks, that issue, would have undermined counsel's argument because the purpose of the reagent blanks is to show a lack of contamination. So if they had focused on that, it would have further pointed out that there was no contamination because Ms. Benziger testified that her reagent blanks were clear. Those, of course, were discarded or lost. At the time, there was no requirement to keep them. Ms. Anderson created her own reagent blanks, which were clear. Now, it's true that those were not with the same chemicals that were used before. However, it's important to note is in the DQ alpha testing, there was one profile in the sperm fraction. And in the STR testing, the profiler-profiler, one profile in the sperm fraction. So if there had been contamination, there would be another profile. And that could have all been flushed out. And that would have seriously, I think, called into question defense counsel's argument. This was very strategic, the way that they approached this DNA. And it's not because there was a problem with the DNA. In fact, there wasn't. In many cases, be it a partial profile or a full profile, if you're not going with the defense of consent in a sex case, then the strategy is to somehow call into question the DNA. That doesn't mean that the challenges are legitimate. It just means that that's the defense. The same would be true for, I would point out just briefly on the Fry issue, Your Honor asked if the change in methodology, for lack of a better word, makes the testing less valid. It does not. I think there's a distinction that's lost here, and that is between the scientific methodology, which is at issue, and a change in quality assurance standards. There's no change in the scientific methodology of DNA testing. There's a change in quality assurance standards, which happens all the time. And if every time, back when DNA testing first began, analysts didn't wear gloves and masks because with the level of testing that was done at that time, it wasn't known that you could possibly contaminate. So that doesn't mean that that testing done in the past is not still generally accepted or should be subject to Fry, just because now they wear gloves and masks and hoods. It's a completely separate issue. And so I think Judge Sheehan is correct in his ruling that there was no shown change in the scientific methodology. There was nothing new or novel. There was just an evolution of some protocols that helped, you know, monitor whether or not contamination has occurred. The underlying science did not change. Excuse me. Counsel also, in support of that argument, mistakenly says that it's akin to ABO blood type testing. But again, there's a mistake made there. ABO blood type testing is still generally accepted in the scientific community. You can test blood and say this sample is blood type B and the defendant has blood type B. So they have the same blood type. The issue is what weight is that given. So in a case where you're putting in tests that were done previously, which happens a lot, cases frequently aren't solved until later, or perhaps there's retrials, and we're already up to, it's now going to be 17 loci for CODIS starting in January. We're up to 17 now. It used to be 13. So things change. That doesn't mean that a test at 13 or a test at 9 is not valid. It's certainly ripe for cross-examination and ripe for argument to try and convince the jury that maybe it's not as good as what we do now, but it's not an issue with, it's certainly not a fry issue, and it's not even an admissibility issue. It's a weight issue, and does she improperly recognize that? With respect to the spill issue, the sequence of the spill is crucial, Justice Smith, you are correct, because there is no dispute in this record. Kenara Anderson testifies consistently that when you have the tube with the extracted DNA, which is what she calls it, which is on the filter paper, you add the chemicals. That pulls the DNA out of the paper and gives you liquid DNA, and that liquid is the extracted DNA, and that's what is measured. Then she clearly says to move on to amplification, I have two test tubes for each sample. I have the profiler test tube and the co-filer test tube. So she pulls some out of, ideally you pull some liquid out, put it in profiler, pulls some out, put it in co-filer, and those amplifications are done separately, and that's because the two kits have different chemicals in those tubes for the amplification. So counsel's suggestion that there could be a re-amp is incorrect. You already have amplified, the end result is amplified product. You cannot re-amp amplified product. You can only amp the actual original product, which, yes, there was a spill, but she had enough to go forward with co-filer, excuse me, profiler, and she had enough, she didn't think she had enough for the target amount for co-filer, but that doesn't mean you don't try, because sometimes you don't have enough for co-filer, but you can get results. Sometimes even when there's not a spill, you end up with a degraded sample, so you get profiler results but not co-filer results. That's what occurs in cases, Harvey Wright, I believe, may have been a degraded sample, I don't recall off the top of my head, but it happens all the time. Non-molecule profiles don't only occur where there may be a spill prior to amplification. And again, this is a weight issue, not an admissibility issue, and that was fully addressed and exploited by, exploited so rather utilized by the defense in their argument that the DNA was not, should not be believed by the jury and therefore they should not convict Mr. Banks. Excuse me. Finally, with respect to the Harvey Wright issue, I'd point out that counsel did not fail to cite Wright, as I've already said. They did rely upon Wright, they argued Wright vociferously, and the claim that counsel was somehow ineffective for not putting it in, I've discussed what the possible pitfalls of that would have been, but also I'd point out that there's absolutely no suggestion that they could have in any way called someone to refute the stats in this case. Don Parker, yes, is the CODIS administrator, and yes, he could have testified to the fact that searches were done, but there's nothing to suggest that he could have testified that that somehow questioned the stats in this case. And I'd point out that if there was, then certainly under Rule 413 of the Discovery Rules, there would have been materials, attendant to an expert opinion, tendered to the state. So that again further suggests that that is not a legitimate argument for counsel to pursue. I guess I would just sum up by saying that I think the record demonstrates that defense counsel provided an absolutely competent and strategic and strong defense for Mr. Banks. Certainly, as your honors have pointed out, the DNA was not the only evidence. There was other evidence that corroborated the DNA that was further circumstantial evidence of chain of custody, for example, and also the propriety of the results of the DNA. And they acted at all times effectively, and many of the claims raised are based on, most of the claims raised are based purely on either speculation or are directly refuted by the record. If your honors have no further questions, we'd ask that you affirm Mr. Banks' conviction. Thank you very much. Thank you. Just a few points. I know you've already indulged me a bit. Just with regard to Anderson and the instruction, I believe in Anderson, counsel is trying to limit that just to the facts of that case. I think the case is, the legal principle there is a bit broader because in Anderson, as we've already discussed, there's a murder and an attempt murder. And the attempt murder requires a specific intent to kill. The jury is not told that it's the specific intent to kill this particular individual. And that ran the confusion of, is there an intent to kill when there's someone dead in the room? It had to draw that distinction. The same kind of distinction is applicable here as to the two priors because the jury could confuse the two. Moving back to the DNA, I think counsel kind of opened the door on something. When we're talking about schizophrenics, counsel was doing a great job and did everything they could. Counsel filed a motion asking for the nine low-side DNA searches. It sat there. It was argued. It was pending for two years. And then counsel withdrew it. Counsel withdrew it and represented it to the trial judge. I've got what I need. I know what the percentages are. I've got those numbers from the scholarly work. I can go with that. I don't need to have another look in the database. And then just before Sonara Anderson is about to take the stand, the state morally moves to eliminate. Don't let him ask those questions because she hasn't read these studies. And I'm not going to continue this. We've got a jury sitting out there. At that point, he has no choice. That was the nature of the ineffectiveness here. If he was going to abandon that because he had that, then he had to make sure he could use it. He ended up having the rug pulled out from under him when the state's expert was about to take the stand. With regard to the argument that there's no re-amp or re-amplification possible, I'm not sure I understand the argument that there's not any re-amplification possible because they've added reagents. The reagents are supposed to be neutral anyway. DNA is DNA. How does adding something that is supposed to be neutral in the study prevent you from re-amplifying? Whether she spilled it before or after the separation really is irrelevant if there's a possibility that this could have been re-amplified again. And I don't see anything in this record, one, that says that it couldn't be, and two, I think what counsel says, she's very clear that this was not, that she separated it and then amplified rather than amplify and then separate or whatever. I think the record there is a bit confusing. And finally, before I sit down and answer other questions, the notion that there was paper put into the tubes and that that's clear on the record, there is no mention of it in the record. She says, I got tubes of dried, extracted DNA on the side of the tubes and I liquefied it. No indication that she had to remove it from the substrate and then add something to liquefy. Nothing of that nature. Now, to the extent that I had, and this frankly I'm a little hesitant to do because it's drawing on a little knowledge outside of this record, so I say that with that caveat in mind. My understanding is that when something is dried onto this filter paper, you don't liquefy the filter paper. What they do is really they use a hole punch. They take some of it and extract the DNA from that portion. They don't liquefy the entire thing that's in the test tube. And there's no mention here of her taking any intermediate steps. And I think that's significant. She says, I just liquefied the stuff that was dried inside the test tube. And so that argument frankly just doesn't make a lot of sense to me. I think we are dealing with apples and oranges here. What Benzie restored and what Senator Anderson got were not the same thing. The descriptions don't meet. Okay, unless there are any other questions. Thank you very much. Thank you. Thank you very much, Rogers. Your briefs were very interesting, very time consuming, and very well done. And your arguments, I have to say in my 12 years as an appellate court judge, the three of you were probably one of the best I've ever seen. So this was fun for us to listen to. Thank you very much.